**In the United States District Court
for the District of Kansas**

———————

Case No. 24-cv-02565-TC

———————

KEVIN CALVERT,

*Plaintiff*

v.

DAIRY FARMERS OF AMERICA, INC.,

*Defendant*

———————

**MEMORANDUM AND ORDER**

Plaintiff Kevin Calvert sued his former employer Dairy Farmers of America, Inc., (DFA) alleging age and disability discrimination. Doc. 40. DFA moves for summary judgment. Doc. 41. For the following reasons, that motion is granted.

**I**

**A**

Summary judgment is proper under the Federal Rules of Civil Procedure when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" when it is necessary to resolve a claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). And disputes over material facts are "genuine" if the competing evidence would permit a reasonable jury to decide the issue in either party's favor. *Id.* Disputes—even hotly contested ones—over facts that are not essential to the claims are irrelevant. *Brown v. Perez*, 835 F.3d 1223, 1233 (10th Cir. 2016). Indeed, belaboring such disputes undermines the efficiency that Rule 56 seeks to promote. *Adler*, 144 F.3d at 670.

1

At the summary judgment stage, material facts "must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671; *see also* D. Kan. R. 56.1(a)–(c). To determine whether a genuine dispute exists, the court views all evidence, and draws all reasonable inferences, in the light most favorable to the nonmoving party. *See Allen v. Muskogee, Okla.*, 119 F.3d 837, 839–40 (10th Cir. 1997). That said, the nonmoving party cannot create a genuine factual dispute by making allegations that are purely conclusory, *Adler*, 144 F.3d at 671–72, 674, or unsupported by the record. *See Scott v. Harris*, 550 U.S. 372, 378–81 (2007).

The moving party bears the initial burden of showing the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues as to those dispositive matters remain for trial. *Celotex*, 477 U.S. at 324; *Savant Homes*, 809 F.3d at 1137.

**B**

This is an employment discrimination case. In short, Calvert contends that his former employer, Dairy Farmers of America, Inc., (DFA), fired him because of his age and disability. The following reflects the context in which this lawsuit arose.

DFA is a farmer-owned cooperative in Kansas. Doc. 40 at ¶ 2.a.i.[1] Calvert started working at DFA in 1998. *Id.* at ¶ 2.a.ii. In 2019, while Calvert worked as a business analyst for DFA, Chuck Quick became Calvert's supervisor. *Id.* at ¶ 2.a.iii. Calvert's previous supervisor, Deborah Schmitz, briefed Quick on Calvert's performance when Quick became Calvert's supervisor. *Id.* at ¶ 2.a.xxi; Doc. 42 at ¶ 41. Schmitz explained to Quick that there were issues with the quality of Calvert's work as well as his ability to work independently and collaboratively with others. Doc. 42 at ¶ 41.

Calvert's performance did not improve in 2019. Quick surveyed DFA's business partners and user community about Calvert after he received feedback from Schmitz. Doc. 42 at ¶ 42. The results of that

---

[1] All document citations are to the document and page number assigned in the CM/ECF system. All facts are uncontroverted unless otherwise specified.

survey indicated that DFA's business partners and users wanted Calvert removed from vendor payroll. *Id.* Quick then removed Calvert from managing vendor payroll so that Calvert could see how others did the work. *Id.* at ¶ 43. Calvert ultimately received a poor performance review in 2019 of 1.7 out of 3. *Id.* at ¶¶ 44, 45, 47. His performance review noted that he struggled to conduct efficient meetings, was disengaged and unresponsive when working from home, and lacked knowledge about certain tasks. *Id.* at ¶ 46.

Calvert's performance also failed to improve in 2020 and 2021. Quick observed Calvert ask for help with tasks that he should have been able to perform without guidance. Doc. 42 at ¶ 51. And Calvert's coworkers complained to Quick that Calvert was committing errors that they had to fix, which took time away from their own tasks. *Id.* Calvert received a poor rating of 2.0 for both 2020 and 2021. *Id.* at ¶¶ 47–50.

Calvert's performance worsened in 2022. Quick's supervisor, Bryan Madel, asked Quick to start having one-on-one meetings with Calvert so they could address his performance issues. Doc. 42 at ¶ 52. Quick started having weekly meetings with Calvert to discuss complaints that he had received about Calvert's work and to review Calvert's work. *Id.* at ¶¶ 53–55. Quick also had a meeting with Calvert and DFA's human resources director Dawn Wissing wherein Quick reminded Calvert about his job responsibilities and informed him that he could be fired if his performance did not improve. *Id.* at ¶ 56. Later in the Fall of 2022, Calvert issued a payment in error, which led to his coworkers doing extra work to correct the mistake. *Id.* at ¶ 58. Calvert finished 2022 with a low rating of 1.4. *Id.* at ¶ 59.

Early in 2023, Madel initiated the process to fire Calvert. Doc. 42 at ¶¶ 67, 68. Calvert was fired in April 2023. *Id.* at ¶ 68. He was sixty years old. Doc. 40 at ¶ 2.a.xi. He was not replaced by another employee. Rather, his work was distributed to his coworkers. Doc. 42 at ¶ 69.

Calvert's claims revolve around his alleged disability. Thus, a brief primer on his disability and the facts surrounding it will help contextualize the dispute.

In April 2022, Calvert went to the hospital and was diagnosed with atrial fibrillation and high blood pressure. Doc. 40 at ¶ 2.a.xii; Doc. 42 at ¶¶ 17, 18. Calvert was in the hospital for three days. Doc. 42 at ¶ 19.

3

When he returned to work, he told his coworkers that he had atrial fibrillation. *Id.* at ¶ 21. But he did not mention that he had high blood pressure. *Id.* at ¶ 23. Calvert admits that neither atrial fibrillation nor high blood pressure prevented him from doing his work or otherwise affected his ability to work. *Id.* at ¶¶ 19, 20. Calvert did not request a reasonable accommodation on account of the two diagnoses. Doc. 40 at ¶ 2.a.xxiii.

Based on these facts, Calvert filed suit in federal court. Doc. 40. He brings two counts of employment discrimination: Count I for age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 623, and Count II for disability discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. § 12112. *Id.* at ¶¶ 4.a.i, 4.a.ii. DFA requests summary judgment. Doc. 41. It argues that Calvert has not made a prima facie case of age or disability discrimination, and that it had legitimate, non-pretextual reasons for firing Calvert.

## II

Calvert argues that DFA unlawfully terminated him because of his age and disability. Doc. 40 at ¶¶ 4.a.i, 4.a.ii. Even assuming he had evidence in support of a prima facie case, his claims still fail because DFA offers a legitimate, non-pretextual reason for firing Calvert and Calvert lacks any evidence that this reason was pretext for discrimination.[2] Accordingly, DFA's motion is granted.

---

[2] It does not appear that Calvert has made a prima facie claim of age or disability discrimination. *See* Doc. 42 at 19–28 (arguing as much). As to age, the parties agree that Calvert was not replaced by any employee, much less a younger one. Doc. 40 at ¶ 2.a.xvii; *see Frappied*, 966 F.3d at 1056 (noting that it is an element of a prima facie case of age discrimination that the plaintiff was "replaced by a younger person"). And as to disability, Calvert did not request a reasonable accommodation, Doc. 40 at ¶ 2.a.xxiii, and he testified that neither atrial fibrillation nor high blood pressure affected his ability to work or caused any ongoing symptoms. Doc. 42 at ¶¶ 19, 20; *see* 42 U.S.C. § 12102(1) (a disability is "a physical or mental impairment that substantially limits one or more major life activities"). But, out of an abundance of caution, this Memorandum and Order will assume without deciding that he has satisfied the prima facie test for both claims because there is no evidence to show that DFA's reasons for firing him were pretextual.

**A**

Calvert's age discrimination claim is governed by the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634, which makes it "unlawful for an employer . . . to discharge any individual . . . because of such individual's age . . . ." 29 U.S.C. § 623(a). This prohibition on discrimination applies to protect "individuals who are at least 40 years of age." 29 U.S.C. § 631(a). A plaintiff suing under the ADEA must prove that the challenged employment action was motivated by age. *Markley v. U.S. Bank Nat'l Ass'n*, 59 F.4th 1072, 1080–81 (10th Cir. 2023). While it is not necessary that age was the exclusive reason for the action, a plaintiff seeking to survive summary judgment must produce evidence "that age was the 'but-for' cause of the employer's adverse decision." *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1056 (10th Cir. 2020) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009)).

And the Americans with Disabilities Act governs his disability discrimination claim. The ADA makes employment discrimination against "a qualified individual on the basis of disability" illegal. 42 U.S.C. § 12112(a). As with an ADEA claim, in the "absence of direct evidence," courts evaluate an ADA discrimination claim using the *McDonnell Douglas* burden-shifting framework. *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1192 (10th Cir. 2018). The prima facie case for discrimination requires a plaintiff to show that he is disabled under the statute, qualified for the job, and that the discriminatory conduct was because of his disability. *Id.* (citing *Kilcrease v. Domenico Transp. Co.*, 828 F.3d 1214, 1218–19 (10th Cir. 2016)).

When a defendant seeks summary judgment on a discrimination claim based on circumstantial evidence, federal courts apply the familiar *McDonnell Douglas* framework.[3] *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 968–69 (10th Cir. 2017). Under that framework, a plaintiff bears the initial burden of establishing a prima facie case of unlawful discrimination. *Id.* at 969. If he or she does so, the burden shifts to the defendant to articulate a "legitimate, nondiscriminatory reason" for taking its adverse action. *Id.* at 970. If the defendant satisfies its burden, the burden shifts back to the plaintiff to prove that the defendant's

---

[3] Neither party contends that there is any direct evidence of discrimination, and each analyzes Calvert's claims under *McDonnell Douglas*. *See* Docs. 42 at 18 & 45 at 7.

proffered reasons were pretextual—i.e., "not the true reason for the employment decision." *Id.*

**B**

If a plaintiff meets his burden of stating a prima facie claim (and this analysis presumes Calvert has done so), the burden shifts to the employer to provide a legitimate reason for its decision. *Lincoln*, 900 F.3d at 1193. The burden to establish a legitimate, nondiscriminatory reason is "exceedingly light." *DePaula*, 859 F.3d at 970. On a motion for summary judgment, a defendant need only "articulate a reason for the [action] that is not, on its face, prohibited and that is reasonably specific and clear." *Frappied*, 966 F.3d at 1058 (quotations omitted). It "need not persuade the court that it was actually motivated by the proffered reasons." *Tex. Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).

DFA has met that burden. It claims to have fired Calvert for poor performance. Doc. 42 at 28. There is a voluminous record that shows Calvert's performance was subpar for several years before his termination. Doc. 42 at ¶¶ 41, 42, 44–51, 58. And poor performance is a legitimate reason to fire an employee. *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1125 (10th Cir. 2005). Calvert makes no argument to the contrary. Doc. 45 at 12.

**C**

Once an employer satisfies its obligation to identify a lawful reason for the termination, the burden returns to the employee to show that the reason for his termination was pretext for discrimination. *Lincoln*, 900 F.3d at 1193. A plaintiff "may show pretext by demonstrating the proffered reason is factually false, or that discrimination was a primary factor in the employer's decision." *Id.* (quoting *DePaula*, 859 F.3d at 970). In other words, a plaintiff may show that the defendant's reason is "so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude [it is] unworthy of belief." *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1039 (10th Cir. 2011); *see also Bekkem v. Wilkie*, 915 F.3d 1258, 1267 (10th Cir. 2019).

Pretext probes the true intentions of the defendant, so the focus is limited to "whether the employer honestly believed its reasons and acted in good faith upon them." *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1119 (10th Cir. 2007). A court's role "is to prevent intentional

6

discriminatory . . . practices, not to act as a 'super personnel depart-ment,' second guessing employers' honestly held (even if erroneous) business judgments." *Dewitt v. S.W. Bell Tele. Co.*, 845 F.3d 1299, 1312 (10th Cir. 2017) (quoting *Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006)). All facts are examined "as they appear *to the person making the decision*, not as they appear to the plaintiff." *Debord v. Mercy Health Sys. of Kan., Inc.*, 737 F.3d 642, 655 (10th Cir. 2013) (citation and internal quotations omitted) (emphasis in original). Any doubts con-cerning pretext are resolved in the plaintiff's favor, but conjecture and bare allegations are not enough to show pretext. *Jencks v. Modern Wood-men of Am.*, 479 F.3d 1261, 1267 (10th Cir. 2007).

Calvert makes two main points in support of pretext. Doc. 45 at 14–17. Both fail.

*First*, Calvert takes issue with his poor performance. In essence, he argues that he was not a poor performer, that three out of his four reviews under Quick were "at target," and that he consistently received good reviews before Quick became his supervisor. Doc. 45 at 14. These arguments fail for at least two reasons. For one, the record is clear that Calvert's performance issues preceded Quick. When Quick took over supervising Calvert from Schmitz, Schmitz spoke to Quick to explain to him the issues with Calvert. Doc. 42 at ¶ 41. And for another, Calvert's subjective assessment of his performance is imma-terial; the relevant inquiry is whether DFA—and his supervisor, Quick, in particular—believed that Calvert performed poorly. *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1170 (10th Cir. 2007). The un-controverted evidence confirms that DFA generally and Quick specif-ically believed Calvert had performed poorly. Doc. 42 at ¶¶ 41, 42, 44–51, 58. And even if Quick's perception of Calvert's performance had been erroneous or unduly critical, that would not, standing alone, show pretext because Calvert's evidence fails to give reason to suspect that discriminatory animus played any part in the decision to fire him. *See Dewitt v. S.W. Bell Tel. Co.*, 845 F.3d 1299, 1311 (10th Cir. 2017) (noting that "when an employee is discharged because of an employer's honest mistake, federal anti-discrimination laws offer no protection").

*Second*, Calvert argues that DFA did not afford him the opportunity to have "progressive discipline." Doc. 45 at 16. That argument fails as a matter of law for several reasons. For one, Calvert was an at-will employee in Kansas. *Campbell v. Husky Hogs, L.L.C.*, 255 P.3d 1, 3 (Kan. 2011). Pursuant to this doctrine, "an employer can terminate an em-ployee for good cause, for no cause, or even for a wrong cause, without

incurring liability to the employee for wrongful discharge." *Bracken v. Dixon Industries, Inc.*, 38 P.3d 679, 682 (Kan. 2002); *see Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1222 (10th Cir. 2007) (finding no pretext where an at-will employee was fired allegedly in violation of the employer's progressive discipline policy). And for another, DFA does not have a policy that requires progressive discipline. Doc. 42 at ¶ 36; *see also* Doc. 45 at 16 (failing to identify any evidence that DFA has a mandatory progressive discipline policy). Calvert attempts to controvert this fact by pointing to the deposition testimony of Dawn Wissing, DFA's human resources director. Doc. 45 at ¶ 36. But Wissing testified that DFA does not have a mandatory progressive discipline policy, Doc. 42-8 at ¶ 8, and she explained that DFA's use of progressive discipline "varies person-to-person and situation-to-situation." Doc. 45-3 at 29. As a result, there is no reason to believe that DFA's decision to fire Calvert was pretextual because DFA failed to follow a mandatory progressive discipline policy it did not have. *See Iweha v. Kansas*, 121 F.4th 1208, 1226 (10th Cir. 2024) ("Where progressive discipline is entirely discretionary, and the employer did not ignore any established company policy in its choice of sanction, the failure to implement progressive discipline is not evidence of pretext.") (alterations omitted); *cf. Kincaid v. Unified Sch. Dist. No. 500, Kansas City, Kansas*, 94 F.4th 936, 949 (10th Cir. 2024) ("[A]n inference of pretext does not follow from every departure from standard procedure.").

## III

For the foregoing reasons, DFA's Motion for Summary Judgment, Doc. 41, is GRANTED.

It is so ordered.


Date: April 8, 2026                    \_s/ Toby Crouse_____
                                       Toby Crouse
                                       United States District Judge

8